UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

In re:

  DAVID KEITH HEFLIN &       Case No. 04-50026
  REBECCA JANE HEFLIN
    Debtor(s)          Chapter 7

_____

C-PLANT FEDERAL CREDIT UNION     Ad. Proc. No. 04-05016
    Plaintiff

vs.

DAVID KEITH HEFLIN &
REBECCA JANE HEFLIN
    Defendant(s)

MEMORANDUM OPINION

   THIS CORE PROCEEDING[1] comes before the Court on Plaintiff C-Plant Federal Credit Union's ("Plaintiff") Verified Complaint to Determine the Dischargeability of Debt and for Judgment for Damages.  The Plaintiff is alleging that David Keith Heflin and Rebecca Jane Heflin ("Defendants") wrongfully removed, disposed of and/or kept tangible personal property and fixtures that were subject to the Plaintiff's security interest.  Plaintiff is requesting that the debt owed to it by the Defendants be held nondischargeable under 11 U.S.C. §§523(a)(4) and (a)(6).  The Defendants respond that the items in question are not fixtures and are not subject to the Plaintiff's security agreement.

_____

  [1]28 U.S.C. §157(b)(2)(B).

1

Based on the statements of counsel, the testimony of witnesses at trial, the evidentiary deposition of Plaintiff David Keith Heflin, and the entire record of this case, this Court finds in favor of the Plaintiff.

### Facts

In 2001 the Defendants contacted the Plaintiff about refinancing the mortgage on their home and property located at 110 Lone Lake Drive, Kevil, Kentucky.  Following the Defendants' application,  an appraisal was done on the home and land.  The apprisal noted the features of the home, including the HVAC air conditioning  unit ("HVAC unit"), a back deck, a front ramp and porch with rail, and a chain link fence surrounding the yard.  Based on this appraisal the Plaintiff extended a $75,500.00 loan to the Defendants in exchange for a lien on their home and property.  The mortgage specified that it covered "all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the Property."

The Defendants were unable to pay their monthly mortgage payments timely, and the Plaintiff initiated a foreclosure action against them.  Upon notice of the foreclosure, the Defendants contacted the Plaintiff and told it that they had found buyers, Tim and Mary Grimm ("Grimms"),  who would purchase the home and lot for the payoff amount.  The Grimms were business acquaintances of the Defendants. Mr. Grimm had been to the Heflin's home on previous occasions to buy trinkets from the Defendants for the Grimms used furniture business. Upon finding out that the Defendants wanted to sell their home, both Tim and Mary Grimm went to look at the Defendants' home and property in April 2003.

2

While the above information is agreed to by both parties, the Defendants and the Grimms disagree as to the details and number of visits the Grimms made to the property. Both Mary and Tim Grimm testified about their one visit to the Defendants' home prior to submitting an offer to purchase the property from the Plaintiff. Mrs. Grimm stated at the time of her first visit there was a chain link fence around the entire property, a railed ramp and porch leading to the front door, a kitchen island with a sink and electric connections, a built-in dishwasher, shelving, blinds in all the windows, an HVAC unit, and a deck off the back of the house. Mr. Grimm was sequestered during Mrs. Grimm's testimony, and largely echoed Mrs. Grimm's account as to the features of the Heflin home. Both of the Grimms testified that the Heflins told them that with the exception of the washer and dryer, everything else, including the air conditioning, deck, fence, rail, cabinets, kitchen island, and blinds would stay with the house.

In contrast, Mr. Heflin had a very different version of events.[2] Mr. Heflin stated that his house had undergone fire damage. The Defendants had hired contractors to do work on the house, but, according to Mr. Heflin, the contractors caused additional damage and then went "bankrupt" leaving the Heflins with a house in shambles and no recourse.[3] According to Mr. Heflin, the contractors got paint on the floors and cabinets, and one of the workers put his foot through a vent. While the contractors were working on the house, Mr. Heflin stated that they ran the air conditioner without a filter causing it to fill with dust and, thereby, breaking it.

Mr. Heflin stated that the Grimms looked at the property two to three times before

---

[2]Mr. Heflin testified through an evidentiary deposition due to health concerns. Mrs. Heflin was not present at the trial, nor did she testify through an evidentiary deposition.

[3]Mr. Heflin claimed he had taken video and pictures of the contractors removing certain items and damaging others. However, none of this documentation was offered into evidence.

3

purchasing it, and that the amenities in the house were not identical from visit to visit.  For example, Mr. Heflin testified that the HVAC unit was broken prior to the Grimms first visit and that the HVAC unit was removed before the Grimms visited the property again.  Additionally, Mr. Heflin stated that there was no dishwasher during any of the Grimms visits, although there was a space for a dishwasher in the kitchen.  The fence chain, according to Mr. Heflin, was also down during at least one of the Grimms' visits, although the poles remained so the next owner could install their own fence.   Mr. Heflin thought that the fence was not part of C-Plant's security interest because it was not attached to the house and was given to him by the state for the use of his son and dog.[4]  He also testified that the back deck was in place the first time the Grimms viewed the property, but the floor boards were not there on subsequent visits.  Similarly, the island was not in the kitchen when the Grimms looked at the property, nor were the blinds in the windows.

In mid-April prior to signing the contract for the house, Mary Grimm obtained  keys to the house from the Heflins and went to measure for window coverings.  Upon arrival, Mrs. Grimm discovered the following items missing which were present the last the last time she visited the property: the  rail leading to the front of the house; the fence chain around the property, although the posts were still in place; back deck floor boards, although the frame was still in place; the kitchen island; the HVAC unit; the dishwasher; the cabinets/shelving; and the blinds in all the windows.  Upon discovering the changes, Mrs. Grimm contacted the Plaintiff

---

[4]  Mr. Heflin testified during his evidentiary deposition that "the chain-link fence was put up for my son dealing with ADHD and bipolar and for a dog, my service dog.  The state paid funds to put up a fence that we could contain – so he could run and play and burn off some energy and everything else that he needed to burn off and do things out there." (Heflin Dep. at 31)

and requested that something be done. C-Plant assured Mrs. Grimm that the house would be returned to its previous condition.  Mr. Grimm then returned the keys to Mr. Heflin, at which time he inquired about the changes to the property.  Mr. Grimm testified that Mr. Heflin was evasive when confronted and questioned about the state of the property.   On April 25, Mr. and Mrs. Grimm went to C-Plant to sign the papers to purchase the house at 110 Lone Lake Drive. Mr. Heflin also came to C-Plant that day to sign the paperwork but remained in his car in the parking lot.

Pursuant to an understanding with C-Plant, the Grimms had the home restored to its previous condition and presented the receipts to C-Plant for reimbursement.   The following receipts were submitted into evidence as proof of damages:

| Item | Note | Cost |
|---|---|---|
| Lowe's Frigidaire Dishwahser | Replaced old unit and hauled away old unit | $299.42 |
| J & L Enterprises | Air Conditioner | $3,668.00 |
| Ed's Lock Shop | Changed Locks | $96.00 |
| J & L Enterprises | Deck; handrails replaced; dryer repair | $869.08 |
| Kitchen's Inc. | Replaced Island | $403.86 |
| Jones Fence Co. | Replaced Fence | $1650.00 |
| | Total: | $6986.36 |

The Defendants filed for bankruptcy on January 1, 2004, and listed C-Plant Federal Credit Union as holding an unsecured nonpriority claim of $5,000.00.  The Plaintiff then filed this motion on April 1, 2004.  The Defendants did not file an answer within the allowed time period but were allowed additional time to answer.  Defendant filed their answer on June 17,

2004. A trial date was initially set for February 15, 2005, but was continued to May 17, 2005. On May 17, 2005, the trial was held with Candy Webb, mortgage loan officer with C-Plant Federal Credit Union, Mary Grimm and Tim Grimm all testifying for the Plaintiff. The Defendant submitted the evidentiary deposition of David Heflin, and Rebecca Heflin neither appeared nor submitted an evidentiary deposition.

## Conclusions of Law

The Plaintiffs are requesting that their debt be found nondischargeable under 11 U.S.C. §§523(a)(4) and (a)(6).

11 U.S.C. §523(a)(4) states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny

The Plaintiff alleges that the Defendants committed larceny by removing fixtures that were covered by the Plaintiff's security interest. The Plaintiff did not brief this issue, argue it at trail, nor cite any cases showing why §523(a)(4) was applicable in this case. This Court could not find a single case in any jurisdiction which utilized a §523(a)(4) analysis in regards to removal of fixtures covered by a security interest. A creditor has the burden of proving that a debt should be held nondischargeable under §523. *In re Stephens,* 26 B.R. 389, 390 (Bankr. WD KY 1983) The Plaintiff has offered no proof or evidence of why §523(a)(4) requires a finding that the debt in the present case should be found nondischargeable. The Plaintiff, therefore, cannot prevail under §523(a)(4).

Under 11 U.S.C. §523(a)(6)

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title

6

does not discharge an individual debtor from any debt –
(6) for willful and malicious injury by the debtor to another entity or to the
property of another entity

In meeting the standard set forth in §523(a)(6), a creditor must show both willfulness and malicious intent. Willful is defined as "deliberate and intentional." *In re Stephens,* 26 B.R. at 389. The Supreme Court has defined malicious as "intent to do harm." *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The Sixth Circuit precedent established in light of *Kawaauhau* requires that the creditor prove the debtor either (1) intended to cause injury to the creditor or their property, or (2) engaged in an intentional act which the debtor knew was substantially certain to result in injury. *In re Sweeney,* 264 B.R. 866, 871(Bankr. WD KY 2001). Willful and malicious does not require personal animosity towards the victim, but only that the debtor knew his actions would result in an injury. *Id.* An "injury" may include conversion of property, which is purposefully depriving a rightful owner of his property permanently or for an extended period of time. *Id.* at 390. Motive and good faith are immaterial to a finding of conversion. *In re Sweeney,* 264 B.R.at 870. Precedent has further established that a willful injury may be proven indirectly by showing that the debtor knew of the creditor's lien rights, yet still took action knowing that doing so would violate those rights. *Id.* at 866.

The Plaintiff alleges that the Defendants injured the property serving as security for its loan to Defendants by wrongfully removing fixtures. Before determining if the Defendants committed conversion, this Court must first determine if the items allegedly converted were fixtures or if they were the rightful property of the Heflins.

Whether something is a fixture is determined by looking at whether the item was (1) annexed, either actually or constructively, to the property; (2) adapted to the use/purpose of the

7

property to which it is connected so as to materially affect its use; and (3) intentionally made a permanent part of the property to which it was annexed. *Tarter v. Turpin,* 291 S.W.2d 547, 548 (KY 1956); *Doll v. Guthrie,* 24 S.W.2d 947, 948 (Ap.Ct. KY 1930).

The current case involves several pieces of property that the Plaintiff is claiming are fixtures. The Defendants, however, claim the property as theirs. The items in question are an HVAC unit, a chain link fence, rear deck planks and floor joists, front ramp and porch rails, cabinets, a kitchen island, a dishwasher, and blinds. Upon application of the above detailed test, this argument must fail as to all the items in question with the exception of the blinds. As the blinds are unique they will be discussed separately.

First, all of these items were annexed to the property. The chain link fence posts, rear deck, and front ramp and porch were all either made of concrete or affixed to the property with concrete. The Defendants simply removed portions of these structures that could be taken down, while leaving the portions that could not be removed. It is inconsequential that the item was attached to the property and not the house as the mortgage covered all improvements to the house and property. Upon attaching the items to the property, the items *as a whole* became annexed to the property. The HVAC unit was a several ton unit that could not be easily moved and was annexed to the property. The cabinets and kitchen island were installed with nails and were clearly attached. The front porch rail, back deck and fence were all attached to the property with concrete. Simply because something, or part of something, could possibly be removed does not mean that it was not attached to the property under fixture analysis. The first prong is satisfied.

Next, this Court must look to whether the use of the items was appropriated to the

8

property.  It is clear that the answer to this question is in the affirmative.  The removal of each of these items materially affected property.   The deck, front ramp and porch rails, the HVAC unit, the kitchen island, fence chain and shelving all materially affected the property and the way in which it was used.  Each of these items was appropriated by the property, and the second prong, therefore, is satisfied.

Finally it is clear that each of these items was intended to be a permanent part of the house.  The deck, fence, and front ramp and porch rails were all set in concrete and show a clear indication that these items were intended to be permanent.  Further, the kitchen cabinets and island were secured with nails.  The air conditioner, weighing several tons, was not the type that could be easily moved.  Simply because an item could possibly be removed does not prevent it from becoming a fixture. The question is whether an item, as a whole, was intended to be part of the larger property.  Clearly the use of cement, the affixing of cabinets and an island, and the size and type of air conditioner at issue lead to the conclusion that each of these items was meant to be permanent.

As mentioned above this Court does not find that the blinds are fixtures.  Blinds are not annexed to the property  because they can easily be removed and replaced at the whim of an owner.  Blinds, similarly, do not become appropriated by the property.  Removing blinds does not materially affect the customary use of the property.  Blinds, while they do serve a function, are largely decorative and can be changed, replaced, and removed at the will of the owner.  Finally, this Court does not find that the blinds were intended to be a permanent part of the structure.  As stated above, the typical blinds are replaceable and are not intended to be permanent.  Without evidence that these blinds are somehow unique, this Court cannot find that

the blinds were fixtures.  The Creditor cannot meet its burden in regards to the blinds.

Having established that, with the exception of the blinds,  the items are fixtures, this Court must then look to see if the Defendants took these items with "willful and malicious" intent.  It is clear that the act of taking these items was willful.  Mr. Heflin admitted in his evidentiary deposition, and Ms. Hammons further stipulated at trial, that the Defendants intended to remove these items from the premises.  The only question remaining is whether these actions were malicious.

The Heflins entered into a mortgage with the Plaintiff on their property including all "improvements, now or hereafter erected on the property, and all easements, appurtenances, and fixtures, now or hereafter are part of the property.  All replacements or additions shall also be covered by this security instrument.  All of the foregoing is referred to in this security instrument as the property."  By removing certain fixtures from the property, Mr. Heflin violated the security agreement.

The "malicious" requirement in §523(a)(6) only requires an intent to do harm.  This Court finds ample evidence that the Heflins knew that the removal of the fixtures in question would damage the property.  The Court finds the Grimms' testimony to be credible and believes that Mr. Heflin misled the Grimms about what would be removed from the property.  Further, this Court has found Mr. Heflin less then forthcoming. Mr. Heflin's testimony was not credible. Although Mr. Helfin claimed the items he removed were rightly his, this Court feels that he knowingly removed the items to damage the property out of anger.  This Court just cannot believe that anyone would think it was acceptable to remove floorboards from a deck or the chain for a fence.  Not only did Mr. Heflin remove items, he removed them in such a way as to

10

create safety hazzards and rendered parts of the property unuseable.  All that Mr. Heflin has proven is that he was angry at C-Plant, and this Court finds that his removal of the fixtures was his way of expressing that anger.

Having found that the removal of the fixtures was willful and malicious, the Plaintiff has satisfied its burden under 11 U.S.C. §523(a)(6) and the Court finds the Defendants' debt to the Plaintiff  nondischargeable.

The Plaintiff submitted six receipts into evidence which it had received from the Grimms for repairs done to the house to restore it to its previous condition.  This Court acknowledges that certain of the charges are valid and should be included in the debt, including $3,668.00 for the air conditioner, $403.86 for the kitchen island,  $1,650.00 to replace the fence, and $299.42 for a frigidaire dishwasher.[5]  However, the three other receipts present problems because they involve damages unrelated to the removal of fixtures.   The J&L Enterprise receipt for $869.09 is for repairs to the deck, replacing the handrails, and repairing the dryer attachment.  Although the deck and handrails are properly included in the damages amount,  the repairing of the dryer attachment is not.  By subtracting the $18.00 charge for the dryer repair, the Plaintiff can include only $851.08 in its nondischargeable debt total.  The Plaintiffs also submitted a receipt from

---

[5] The Court would like to note a discrepancy regarding the dishwasher.  Both Mrs. Grimm and Mr. Helfin testified that the dishwasher was not at the house upon Mrs. Grimm's final visit.  Mrs. Grimm testified that the dishwasher had been there on previous occasions, and was in working condition, and that the Heflins told the Grimms it would remain with the house.  In contrast, Mr. Heflin testified that the dishwasher had been broken and was not present in the house at any of the Grimms visits.  The receipt from Lowe's includes a handwritten notation that states "Replace old unit w/ new and haul away old unit."  This note makes it appear that the dishwasher was still at the home since it indicates an old unit (presumably a dishwasher) was removed.  Since both the Grimms and Mr. Heflin state that there was no dishwasher in the home this Court will disregard the notation on the receipt and find that the dishwasher, a fixture, was removed from the home.

Ed's Lock Shop for $96.00 for changing the locks.  Mrs. Grimm stated that she wanted the locks changed because she feared the Heflins would return to the home and do more damage.  This Court will make no determination as to the validity of this fear, but it does find that changing the locks cannot be included in the nondischargeable debt.  This Court has found that the Defendants cannot discharge the debt stemming from their removal of fixtures covered by the Plaintiff's security agreement.  The fact that the locks were in working order and that the Grimms chose to change them is separate from damage to the fixtures and cannot be included in the nondischargeable debt.

This Court finds that the Plaintiff failed to satisfy the requirements under 11 U.S.C. §523(a)(4).  This Court holds, however, that the Plaintiff prevailed and satisfied the requirments under 11 U.S.C. §523(a)(6) and finds the debt owed by the Defendants to the Plaintiff in the amount of $6,872.36 nondischargeable.

A separate Order consistent with the foregoing has been entered in accordance with the Federal Rules of Bankruptcy Procedure 9021.